# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

RICHARD GRAF MILLER,

       Plaintiff,

v.                                  Case No. 18-11429

MICHAEL ERIC JOAQUIN and
FATHER AND SONS
COLLECTIBLES, INC.,

       Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANT'S "RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW," CONDITIONALLY GRANTING DEFENDANT'S "MOTION FOR NEW TRIAL," AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S "MOTION FOR RELIEF FROM JUDGMENT"

Plaintiff Richard Graf Miller sues Defendants Michael Eric Joaquin and Father and Sons Collectibles, Inc., ("Father and Sons") for breach of contract, common law conversion, statutory conversion, and fraud. A trial was held on these counts and the jury found in favor of Miller and against Joaquin in the amount of $180,000. (ECF No. 40, PageID.391-93.) Joaquin moves for judgment nontwithstanding the verdict ("JNOV") and for a new trial. (ECF Nos. 54, 45) Joaquin also moves for sanctions and relief from judgment due to Miller's failure to sign answers to interrogatories. (ECF No. 52.) All three motions have been fully briefed. (ECF Nos. 51, 53, 57-60.) The court finds a hearing unnecessary. E.D. Mich. L.R. 7.1(f)(2). For the reasons provided below, the court will grant Joaquin's motion for JNOV. A new trial will be conditionally granted. Finally, Miller will be sanctioned for his failure to sign answers to interrogatories.

# I.  BACKGROUND

Miller was a coin collector who owned hundreds of gold and silver coins. Miller considered selling some of his coins. In February 2017, Miller met with Michael Joaquin of Father and Sons Collectibles, Inc., to discuss the potential sale of at least 256 coins. (ECF No. 47, PageID.493-94; ECF No. 42, PageID.405.) The exact number of coins Miller offered is uncertain.

Miller and Joaquin entered into an oral agreement. Joaquin listed the coins one by one on a sheet of paper. (ECF No. 42, PageID.398-404.) The parties agreed that Joaquin would take the coins and sell them to third parties, potentially at coin shows. (ECF No. 47, PageID.546, 616-17.) Joaquin was to obtain fair market value for the coins. (*Id.*, PageID.547, 577.) For any sales, Miller would be entitled to 80% of the proceeds while Joaquin would have a right to 20%. (*Id.*)

Joaquin took possession of the coins and gave Miller a down payment of $5,000. (*Id.*, PageID.577, 547, 579.) Joaquin then sold the coins. (*Id.*, PageID.620.) Joaquin testified to receiving $18,000 for the coins, mostly from two companies, Eastern Numismatics and Numismatics Unlimited, not from coin shows. (*Id.*, PageID.620, 628.) Miller and Joaquin dispute the amount of money Joaquin mailed to Miller after the sale of the coins. (*Id.*, PageID.605.) Joaquin claims he gave Miller a total of $15,000 in four checks including the down payment. (*Id.*) Three check stubs were introduced into evidence totaling $12,000. (ECF No. 43, PageID.406-08.) Nonetheless, Miller maintained he received only $11,000. (ECF No. 47, PageID.546.)

Miller filed suit in federal court in May 2018 against both Joaquin and Father and Sons. (ECF No. 1.) Miller alleged that Joaquin's actions constituted fraud, statutory

conversion, common law conversion, breach of contract, and unjust enrichment. (*Id.*, PageID.4-8.) Miller sought other equitable remedies as well. (*Id.*) A four-day trial was held between May 27 and May 30, 2019. The jury returned a verdict in favor of Miller on breach of contract, common law conversion, statutory conversion, and fraud. (ECF No. 40, PageID.391-93.) The jury found Joaquin personally liable on all these claims and awarded Miller $180,000. (*Id.*) The jury marked on the verdict form that Father and Sons was not liable for breach of contract, common law conversion, and statutory conversion. (ECF No. 40, PageID.391-92.) The jury did not mark whether Father and Sons was liable for fraud on the verdict form, but the jury foreman did announce only Joaquin liable, as he did for the other claims, when rendering the verdict in court. (*Id.*; ECF No. 48, PageID.732-33.)

## II. STANDARDS

### A. JNOV

In the Sixth Circuit, "a federal court sitting in diversity must apply the standard for judgments as a matter of law of the state whose substantive law governs." *Lindenberg v. Jackson Nat'l Life Ins. Co.*, 912 F.3d 348, 360 (6th Cir. 2018) (quoting *DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 468 (6th Cir. 1996)). Miller brought his suit under diversity jurisdiction. (ECF No. 1, PageID.2, ¶ 4-5.) Miller's claims arise under state law, the parties are diverse, and Miller alleged an amount in controversy exceeding $75,000 in good faith. *See Charvat v. GVN Michigan, Inc.*, 561 F.3d 623, 628 (6th Cir. 2009).

Michigan's JNOV functions in a very similar way to the federal system's judgment as a matter of law. *See* Fed. R. Civ. P. 50(b); *Ford v. County of Grand Traverse*, 535

F.3d 483 (6th Cir. 2008). Under Michigan law, "a party may move to have [a] verdict and judgment set aside, and to have judgment entered in the moving party's favor." Mich. Ct. R. 2.610(A)(1). The court must "examine the testimony and all legitimate inferences that may be drawn in the light most favorable to the plaintiff. If reasonable jurors could honestly have reached different conclusions, the motion should be denied." *Matras v. Amoco Oil Co.*, 424 Mich. 675, 681-82 (1986); *see also Wiley v. Henry Ford Cottage Hosp.*, 668 N.W.2d 402, 407 (Mich. Ct. App. 2003).

### B. New Trial

"In a diversity case, the question of whether a new trial is to be granted is a federal procedural question and is to be decided by reference to federal law." *J.C. Wyckoff & Ass. V. Standard Fire Ins. Co.*, 936 F.2d 1474, 1487 n.20 (6th Cir. 1991) (*quoting Toth v. Yoder Co.*, 749 F.2d 1190, 1197 (6th Cir. 1984)).

Under Federal Rule of Civil Procedure 59(a) "[a] court may, on motion, grant a new trial on all or some of the issues . . . after a jury trial." "[A] new trial is warranted when a jury has reached a 'seriously erroneous result' as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, *i.e.*, the proceedings being influenced by prejudice or bias." *Holmes v. City of Masillion*, 78 F.3d 1041, 1045-46 (6th Cir. 1996) (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940); *CFE Racing Prods., Inc. v. BMF Wheels, Inc.*, 793 F.3d 571, 584 (6th Cir. 2015).

### III. DISCUSSION

Joaquin moves for judgment as a matter of law and a new trial on Joaquin's personal liability for breach of contract, Joaquin's liability for conversion and fraud, and

on the extent of damages the jury awarded Miller. Joaquin's motion for judgment as a matter of law will be construed as a motion for JNOV under Michigan law. *See Lindenberg*, 912 F.3d at 360. Joaquin also seeks sanctions and relief from judgment for Miller's failure to provide signed answers to interrogatories. The court will address each issue in turn.

### A. Joaquin's Personal Liability for Breach of Contract

"An agent who contracts with a third party on behalf of a disclosed principal is generally not liable to the third party in the absence of an express agreement to be held liable." *Howard & Howard Attorneys P.L.L.C. v. Jabbour*, 880 N.W.2d 1, 1 (Mich. Ct. App. 2015) (citing *Nat'l Trout Festival, Inc. v. Cannon*, 189 N.W.2d 69, 70-71 (Mich. Ct. App. 1971)). A principal is disclosed if "a party transacting with the principal's agent has notice that the agent is acting for the principal and notice of the principal's identity." *Penton Pub., Inc. v. Markey*, 538 N.W.2d 104, 105 (Mich. Ct. App. 1995) (citing *Dodge v. Blood*, 299 Mich. 364, 370 (1941)). "A characteristic of an agent is that he is a business representative. His function is to bring about, modify, accept performance of, or terminate contractual obligations between his principal and third persons," to the extent that the principal provides an agent with authority to do so. *Uniprop, Inc. v. Morganroth*, 678 N.W.2d 638, 641 (Mich. Ct. App. 2004).

Here, the evidence is overwhelming that Joaquin was acting as an agent to Father and Sons when he made an oral contract with Miller to sell Miller's coins. Even drawing legitimate inferences in favor of Miller, no reasonable juror could find Joaquin personally liable for a breach of contract. *Matras*, 424 Mich. at 681-82.

First, Miller was made aware of Joaquin's status as agent to Father and Sons. The indexing of the coins at issue were written, with the understanding and agreement of Miller, on paper with the letterhead of Father and Sons. (ECF No. 42, PageID.398-404; ECF No. 47, PageID.496, 544.) This list of coins served as the initial basis of the contract. (ECF No. 47, PageID.496, 503, 545.) It listed the subject matter of the contract, namely each coin Miller wished to sell, and Joaquin's first attempt at providing a valuation for the coins. (ECF No. 42, PageID.398-404.) Joaquin signed each page at the bottom. (ECF No. 42, PageID.398-404.) Miller testified that Joaquin made the list and presented it to Miller at the time of their negotiations. (ECF No. 47, PageID.545.). In fact, Miller stated that "the only list I went off of [with regards to the coins at issue] was the one that [Joaquin] provided me." (*Id.*) If Miller was not already aware of Joaquin's business relationship from their contacts to arrange their in-person meeting in February 2017, Miller was certainly put on notice that Father and Sons existed as an entity and that Joaquin was acting as agent for Father and Sons. *Markey*, 538 N.W.2d at 105.

Second, Henry Benjamin, a close confidant of Miller who was deeply involved in the creation of the contract, observed that Joaquin was acting as an agent of Father and Sons. Benjamin hosted the negotiations, advising Miller and allowing the contract discussions to take place in his office. (ECF No. 47, PageID.495.) Benjamin admitted that he "helped negotiate the deal" and was "basically acting as [Miller's] agent in [the] transaction." (*Id.*, PageID.496, 507.) Given his extensive personal experience with the contracting process, it is notable that when asked what he "under[stood] the relationship [was] between [Joaquin] and Father [and] Sons," Benjamin responded that "[Joaquin] represented Father and Sons." (*Id.*, PageID.505.)

Third, all checks made payable to Miller for his coins were written from Father and Sons, not Joaquin personally. (ECF No. 43, PageID.406-08.) After negotiations in which major documents were written on Father and Sons' paper and a knowledgeable observer understood Joaquin to be representing Father and Sons, it was Father and Sons who followed through with payment. Michigan law recognizes that the parties' course of performance can assist the court in interpreting a contract. In cases where the terms of a contract are ambiguous, "the practical interpretation given to [the] contract[] by the parties . . . while engaged in their performance and before any controversy has arisen concerning them, is one of the best indications of their true intent." *Klapp v. United Ins. Group Agency, Inc.*, 468 Mich. 459, 479 (2003) (quoting *People v. Mich. Ctr. R. Co.*, 145 Mich. 140, 166 (1906)). Here, the course of performance strongly supports the intent of Father and Sons and Miller to be bound by the contract. Father and Sons delivered the money to Miller. This money served as the only real consideration in the agreement for Miller's coins. In response, Miller read the check, understood its significance, and accepted the money. (*See* ECF No. 47, PageID.546-47.) Significantly, this course of conduct began only hours after the formation of the contract when Joaquin provided Miller with a down payment of $5,000, on a Father and Sons' check. (ECF No. 43, PageID.406; ECF No. 47, PageID.577, 547, 579.)

Fourth, Joaquin provided uncontradicted testimony that he was acting on behalf of Father and Sons throughout the course of his business interactions with Miller. Joaquin claimed at trial that "all [his coin] business" is "[done] through Father [and] Sons." (ECF No. 47, PageID.593.). In contrast, Miller has presented no evidence to contradict Joaquin or to otherwise subject this testimony to doubt. Miller himself never

testified to any belief that he was contracting personally with Joaquin. In fact, Miller was asked about Father and Sons only once. Miller was questioned about the terms of his contract *with Father and Sons* and answered without disagreeing with the premise of the question. (ECF No. 47, PageID.569-70.)

The only substantive and factual argument the court can surmise from Miller in favor of Joaquin's personal liability is that Miller interacted with Joaquin when forming the contract. However, when an agent such as Joaquin is negotiating on behalf of Father and Sons, Father and Sons itself has no physical existence beyond that of its agents. *Uniprop*, 678 N.W.2d at 641; *Green v. Ziegelman*, 873 N.W.2d 794, 803 (Mich. Ct. App. 2015) (quoting *Bruun v. Cook*, 280 Mich. 484, 495 (1937)) (A corporation "is an artificial being, invisible, intangible, and existing only in contemplation of law."). The evidence unambiguously points to Joaquin providing notice of the existence of Father and Sons and his status as Father and Sons' agent. *Penton Pub.*, 538 N.W.2d at 105; *Howard & Howard*, 880 N.W.2d at 1. No express agreement binding Joaquin personally to the contract exists. *Howard & Howard*, 880 N.W.2d at 1.

Given the substantial evidence that Miller entered into the contract with Father and Sons and the total lack of evidence showing that Joaquin bound himself personally as a contracting party, no reasonable juror could find Joaquin personally liable for breach of contract. *Matras*, 424 Mich. at 681-82. Joaquin is entitled to JNOV.[1] *Id.*

---

[1] Even if the court denied JNOV in favor of Joaquin, a new trial would be necessary. *See* Mich. Ct. R. 2.610(C); Fed. R. Civ. P. 50(c). Joaquin's personal liability is "against the weight of the evidence." *Holmes*, 78 F.3d at 1045-46. A jury verdict in favor of personal liability, "compar[ing] the opposing proofs and weigh[ing] the evidence," could not "reasonable have been reached." *Conte v. Gen. Housewares Corp.*, 215 F.3d 628, 637 (6th Cir. 2000). The court is not stepping into the shoes of the jury and deciding credibility questions. *Denhof v. City of Grand Rapids*, 494 F.3d 534,

## B. Joaquin's Liability for Conversion

Common law conversion is defined as "any distinct act of dominion wrongfully exerted over another's property in denial or inconsistent with his rights therein." *Aroma Wines & Equip, Inc. v. Columbian Distrib. Servs., Inc.*, 497 Mich. 337, 346 (2015) (quoting *Thoma v. Tracy Motor Sales, Inc.*, 360 Mich. 434, 438 (1960)). Statutory conversion allows for recovery of treble damages "against a person who steals or embezzles property or converts property to the . . . person's own use." *Id.* at 354 (quoting Mich. Comp. Laws § 600.2919a(1)(a)). Both claims are based in tort.

Michigan law is well-established that parties cannot sue in tort over relationships governed by contract. "If a relation exists that would give rise to a legal duty without enforcing the contract promise itself, the tort action will lie, otherwise it will not." *Ulrich v. Fed. Land Bank of St. Paul*, 480 N.W.2d 910, 912 (Mich. Ct. App. 1991); *see also Brewster v. Martin Marietta Aluminum Sales, Inc.*, 378 N.W.2d 558, 569 (Mich. Ct. App. 1985) ("[P]laintiff's cause of action arose from a breach of promise or the nonfeasance of a contractual obligation and her action is in contract, not tort."). If it were otherwise, contractual obligations and all their limitations and scope of remedies would be overridden. For instance, contracting parties would be held liable for "all consequential damages arising from [a breach]." *Hart v. Ludwig*, 347 Mich. 559, 563 (1956). The societal obligations of tort would then replace the private terms of a tailored agreement. Such a result would undermine the very purpose of contracts, predictability and managed expectations. *Mill's Pride, Inc. v. Continental Ins. Co.*, 300 F.3d 701, 705 (6th

---

543 (6th Cir. 2007). Instead, the evidence is one-sided and decisive, presenting no material dispute.

Cir. 2002) ("Prime objectives of contract law are to protect justified expectations of the parties and to make it possible for them to foretell with accuracy what will be their rights and liabilities under the contract.").

Thus, when a party to a contract can adequately resort to a remedy in contract law, that party must be bound by the agreement into which she willingly entered. However, if an opposing party's action caused harm outside duties imposed in a contract, no damage to the freedom of contract can be expected given that "a tort action would lie without having recourse to the contract itself." *Hart*, 347 Mich. at 565. Without this notable exception, harms that arise out of behaviors initiated to perform a contract would have no recourse at all.

Here, Miller's allegations of conversion are entirely covered by the obligations he entered into through his contract with Father and Sons. Miller has no need to resort to the tort remedies of conversion as all his damages can be adequately addressed through a breach of contract claim.

It is unclear on what Miller based his case for conversion, both for statutory and common law conversion. Miller's briefing for the current motions focuses on the law of a conversion suit sounding in contract, not the facts of the case. Miller's complaint claimed that Joaquin had "converted [Miller's] [coins]" and thus committed statutory conversion. (ECF No. 1, PageID.5, ¶ 24.) This is a conclusory statement which provides no basis to distinguish between Joaquin's alleged breach of contract and conversion. For common law conversion, Miller asserted that Defendants "refus[ed] to return the coins and continu[ed] to possess [Miller's] property." (*Id.*, PageID.6, ¶ 26.) However, it is uncontested that the agreement between the parties was that Joaquin was to take

possession of Miller's coins and sell them. Miller was to receive money, not coins, in return. Thus, the contractual terms Miller entered into required that Joaquin take possession of Miller's coins. If Joaquin did not actually sell the coins as he promised to do (as an agent of Father and Sons), that is a breach of contract, not conversion. If Miller claims that Joaquin kept money Miller was owed, which Miller does not make explicit in his conversion claims, that too would be governed by contract. Furthermore, if there were a theoretical contract term that required Joaquin to return any coins not sold, that, again, would be governed by contract, not conversion.

Miller appeared to repeat this unfounded logic at trial. Miller's counsel argued that "[i]f you believe that [Joaquin] had the coins on consignment and he disposed of them without his permission, that would be conversion." (ECF No. 47, PageID.477.) Neither party contests the fact that Joaquin had the contractual right to have possession of the coins and dispose of them through sale. (ECF No. 47, PageID.546, 616-17.) Thus, Joaquin had permission to hold the coins. If Joaquin did not sell the coins in the matter prescribed in the contract, perhaps by not selling the coins at a coin show, Miller has an adequate remedy in a suit for breach.

More strikingly, Miller's counsel later maintained that the conversion occurred "when [Joaquin] decided that he was going to sell the collectables without even notifying my clients or an accounting for them and taking the money and using it for [Joaquin's] own benefit." (ECF No. 48, PageID.683.) To the extent that Joaquin kept money that was owed to Miller under the contract, namely 80% of any sale proceeds, Joaquin violated contractual obligations and Miller can sue for breach. Any further claim that

conversion somehow encompasses a mandatory duty to provide notice or records for property lawfully in possession of another has no basis in the law.

The court's reasoning conforms to the findings of other Sixth Circuit courts that have interpreted Michigan's law of conversion. In *Krause v. Stroh Brewery Co.*, 240 F.Supp.2d 632 (E.D. Mich. 2002), debtors sued their creditors for conversion resulting from the seizure of the debtors' assets as collateral when the creditor collected on a loan. Given that the seizure occurred within the scope of a loan agreement, the court dismissed the conversion claim "because [it] does not arise out of a separate and distinct legal duty as does the contractual obligation." *Id.* at 636.

In *Oak Street Funding, L.L.C. v. Ingram*, 749 F.Supp.2d 568 (E.D. Mich. 2010), the court also dismissed a conversion claim by a debtor against its creditor for the creditor taking possession of collateral. The court there recognized that "a plaintiff may not simply re-cast a contract claim as a tort claim where the plaintiff essentially seeks to enforce the contractual arrangement." *Id.* at 578.

In *Sudden Serv., Inc. v. Brockman Forklifts, Inc.*, 647 F.Supp.2d 811 (E.D. Mich. 2008), a parts supplier for forklifts sued its customer for conversion for failing to pay amounts owed. There the court noted that "[the] [p]laintiff and [the] [d]efendant engaged in the sale and purchase of goods according to an express contract" and dismissed the claim as "aris[ing] from [a] breach of contract (and not the appropriation of specific funds in violation of a separate legal duty)." *Id.* at 816.

Lastly, in *Llewellyn-Jones v. Metro Property Group, L.L.C.*, 22 F.Supp.3d 760 (E.D. Mich. 2014), the court dismissed a conversion claim against a property management company for charging unnecessary repair fees and litigation costs. The

court reasoned that "[i]f it were not for the parties' management agreement, the defendants would have had no legal obligation to make repairs or initiate legal proceedings." *Id.* at 789. Thus, the court found the suit governed by contract, not conversion. *Id.*

Thus, any claim the court is able to deduce from Miller's cryptic arguments in favor of conversion is not justified in the law. At best, Joaquin was under only a contractual duty to obtain Miller's coins, sell them at fair market value, and return 80% of the proceeds to Miller. *Ulrich*, 480 N.W.2d at 912; *Brewster*, 378 N.W.2d at 569. (ECF No. 47, PageID.546, 547, 577, 616-17.) If Joaquin failed to perform these duties, Miller's right to compensation is through breach alone, and not through a tort such as conversion. *Hart*, 347 Mich. at 563.

The court will grant JNOV in favor of Joaquin as to his liability for conversion. The court bases its determination on the law of contract and conversion. To the extent there are factual disputes which would require findings of fact, no reasonable juror could find in favor of Miller for conversion.[2] *Matras*, 424 Mich. at 681-82.

## C. Joaquin's Liability for Fraud

To prevail on a claim of fraud under Michigan law, a plaintiff must prove "(1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth as a positive assertion; (4) the defendant

---

[2]  The court will also conditionally grant Joaquin's motion for new trial on the issue of Joaquin's liability for conversion. *See* Mich. Ct. R. 2.610(C); Fed. R. Civ. P. 50(c). A "seriously erroneous result has occurred" as a verdict in favor of Miller on conversion is "against the weight of the evidence." *Holmes*, 78 F.3d at 1045-46. Thus, a new trial would be necessary.

made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage." *M&D, Inc. v. W.B. McConkey*, 585 N.W.2d 33, 36 (Mich. Ct. App. 1998); *Hi-Way Motor Co. v. Int'l Harvester Co.*, 398 Mich. 330, 336 (1976). Fraud includes an elevated standard of proof. A plaintiff must provide clear and convincing evidence that a fraud occurred. *Foodland Distribs. v. Al-Naimi*, 559 N.W.2d 379, 382 (Mich. Ct. App. 1996); *Hi-Way Motor Co.*, 398 Mich. at 336.

Fraud cannot be used to sue for future promises. *Higgins v. Lawrence*, 309 N.W.2d 194, 197 (Mich. Ct. App. 1981); *Marrero v. McDonnell Douglas Capital Corp.*, 505 N.W.2d 275, 279 (Mich. Ct. App. 1993); *Cook v. Little Caesar Enter.*, 210 F.3d 653, 658 (6th Cir. 2000). Fraud is actionable only for false representations of past or existing facts. *Higgins*, 309 N.W.2d at 197; *Marrero*, 505 N.W.2d at 279; *Cook*, 210 F.3d at 658. "Future promises are contractual." *Hi-Way Motor Co.*, 398 Mich. at 336. If a plaintiff wishes to sue for a defendant's failure to abide by a promise, the plaintiff can resort to a breach of contract claim. Furthermore, "a mere broken promise . . . is [not] evidence of fraud." *Marrero*, 505 N.W.2d at 279; *Higgins*, 309 N.W.2d at 197 ("[T]he fact that [an] apparent promise was broken did not constitute fraud, nor was it evidence of fraud.").

Here, Miller's allegations of fraud are generally stated and indistinguishable from Joaquin's alleged breach of contract. Miller's complaint, strikingly conclusory given the heightened pleading requirements for fraud, merely states that Joaquin made false representations, Miller relied on the representations, and that Miller was harmed. *Coffey v. Foamex L.P.*, 2 F.3d 157, 161-62 (6th Cir. 1993) (citations removed) ("[P]laintiff, at a minimum, [must] allege the time, place, and content of the alleged misrepresentations

on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud."). (ECF No. 1, PageID.4-5, ¶¶ 18-21.) The factual allegations in support of Miller's fraud claim include descriptions only of Joaquin contracting with Miller and insinuations, not made explicit, that Joaquin did not sell the coins or did not pay Miller what Miller was owed. (ECF No. 1, PageID.3-4, ¶¶ 8-17.) These are purely contractual claims based on enforcement of future promises. In fact, Miller relies on and cites to exactly the same facts for both his fraud and breach of contract claims. (*Id.*, PageID.4, ¶ 18; *id.*, PageID.8, ¶ 39.) The best the court can glean from Miller's allegations is that Joaquin committed fraud by saying he would do something (sell the coins and provide compensation to Miller), which Joaquin ended up not doing. However, promising to do an act that is later not performed is not a "false representation" actionable for fraud. *Higgins*, 309 N.W.2d at 197; *Marrero*, 505 N.W.2d at 279; *Cook*, 210 F.3d at 658. If Miller wishes to collect compensation and enforce terms of an agreement, he must do so through the limitations and contours of contract law in a suit for breach.

Miller's arguments did not change at trial. Miller never supplemented or amended his fraud claims to make them distinguishable from breach of contract. After review and proposed alterations, the agreed jury instructions used at trial allowed for a claim of fraud only if Miller proved that Joaquin misrepresented a material fact of "something past or present." (ECF No. 38, PageID.382-83.) The court repeated this instruction on the record directly to the jury. (ECF No. 48, PageID.670.)

At trial, Miller's counsel was unclear as to what exactly Miller's theory of fraud was. When counsel did present substantive arguments, they all concerned actions

Miller and Joaquin bargained for to form a contract, in line with Miller's complaint. At one point, counsel argued that fraud "[is] about deceit . . . [i]ts about misrepresentation — misrepresenting the facts and what you plan on doing." (ECF No. 47, PageID.478.) To the contrary, general claims of fraud, as put forth by Miller's complaint and described in the jury instructions, unquestionably do not include statements of facts occurring in the future. Counsel applied that law to Joaquin by claiming Joaquin "knew he wasn't going to coin shows." (*Id.*, PageID.479.) Just because Joaquin knew he was not going to coin shows when he had previously contracted to do so does not mean that Joaquin committed fraud. Acting so as to breach a contract is a breach of contract, it is not a fraudulent misrepresentation of fact actionable under Michigan law. *Higgins*, 309 N.W.2d at 197; *Marrero*, 505 N.W.2d at 279; *Cook*, 210 F.3d at 658.

At closing, Miller's counsel argued "[Joaquin] was telling [Miller] things [Joaquin] didn't do," again confirming that Miller conflated breach of contract with allegations of fraud. (ECF No. 48, PageID.686.) Miller also seemed to misunderstand the fundamental point of law that evidence of breach is not evidence of fraud. *Marrero*, 505 N.W.2d at 279; *Higgins*, 309 N.W.2d at 197. At one point in the trial, the court specifically asked Miller's counsel to clarify what the alleged misrepresentation was. (ECF No. 47, PageID.645-46.) Counsel responded that Joaquin promised to sell the coins at coin shows and at fair market value, all contractual terms. (*Id.*)

Thus, none of the arguments for fraud presented to the jury were based on past or present misstatement of facts. The legal structure in which the jury was asked to decide the fraud claim, embodied in the jury instruction, limited the jury's analysis to past and present facts. (ECF No. 38, PageID.381-83.) From the beginning of the suit,

Miller advanced a general claim of fraud based on alleged actions indistinguishable from Joaquin's alleged breach of contract. (ECF No. 1, PageID.4-5, ¶¶ 18-21.) Similar to Miller's claim for conversion, Miller cannot transfigure his contractual rights into a tort claim. Miller exchanged future promises with Joaquin and must rely on contract principles for redress. Contracts are purposefully designed to govern such disputes. It is incumbent on a court to require that parties go through proper legal channels to resolve commercial disputes. Only then can a court prevent the economic relations governed by contract from "drown[ing] in a sea of tort." *Neibarger v. Universal Coop., Inc.*, 439 Mich. 512, 528 (1992).

Miller's arguments hint at a claim for fraudulent inducement or promissory fraud. A fraudulent inducement claim avoids the general prohibition of litigating promises through fraud. *Hi-Way Motor Co.*, 398 Mich. at 338. However, to do so "a promise [must be] made in bad faith without intention of performance." *Id.* According to Black's Law Dictionary, "bad faith encompasses actions "not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." *Medley v. Canady*, 337 N.W.2d 909, 913 (Mich. Ct. App. 1983). In a different legal context, the Michigan Supreme Court defined "bad faith" as "arbitrary, reckless, indifferent or intentional disregard of the interests of the person owed a duty." *Commercial Union Ins. v. Liberty Mut. Ins.*, 426 Mich. 127, 136 (1986). To succeed on a fraud in the inducement claim, a plaintiff must prove that "a party materially misrepresents future conduct under circumstances in which the assertions may reasonably be expected to be relied upon and are relied upon." *Samuel D. Begola Servs., Inc. v. Wild Bros.*, 534 N.W.2d 217, 219 (Mich. Ct. App. 1995) (citing *Kefuss v. Whitley*, 220 Mich. 67, 82-83 (1922)).

The problem is Miller never actually litigated this claim. Fraudulent inducement was not included in Miller's complaint. (ECF No. 1, PageID.4-5, ¶¶ 18-21.) It was not explained, after consultations with the parties, in the jury instructions. (ECF No. 38, PageID.381-83.) Nowhere in Miller's complaint or arguments at trial are any references to the nuances of this complex legal claim. Miller includes no mention of "the bad faith exception" to the bar on fraud for future facts, the definition of "bad faith," "inducement" of any sort, or the elements of a valid fraudulent inducement claim. (ECF Nos. 1, 46-48.) Nor did Miller previously address the challenging legal contours of the economic loss doctrine, which allows a suit for fraudulent inducement only where "misrepresentations . . . induce a buyer to enter a contract but . . . do not themselves constitute contract or warranty terms subsequently breached by the seller," given the need to protect the viability of contract law. *Huron Tool and Eng'g Co. v. Precision Consulting Servs. Inc.*, 532 N.W.2d 541, 546 (Mich. Ct. App. 1995). (*Id.*) Where the fraudulent representations are "indistinguishable from the terms of the contract . . . that [the] plaintiff alleges were breached," which appears to be the case here, no claim will lie in tort. *Id.*; *General Motors Corp. v. Alumi-Bunk, Inc.*, 482 Mich. 1080, 1080 (2008) (Young, J., concurring) ("[T]here is no way to characterize these identical allegations as separate claims for breach of contract and fraudulent inducement.").

The court will not do Miller's job for him. In the American system of law, it is the parties' responsibility advance claims, arguments, issues, and defenses. *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 357 (2006) ("In our system . . . the responsibility for failing to raise an issue generally rests with the parties themselves."). This is especially true for the plaintiff, who has the primary responsibility of using his or her judgment on

18

which claims to bring in a lawsuit. Fed. R. Civ. P. 3, 8(a). The decisions as to what suits to advance and issues to argue are strategic decisions that should be determined after carefully weighing their potential success against costs, confusion, and other considerations. Such decisions are not for the court to retrospectively make months after the end of a trial.

Thus, the court will not take it upon itself to unilaterally adopt a novel legal theory on behalf of Miller, which may or may not be viable, which neither party addressed with legal analysis or citation before the verdict was reached, and on which the jury was not asked to deliberate. Notably, courts that have addressed fraudulent inducement and the "bad faith exception" routinely do so only after that plaintiff has actually presented the issue. *Marrero*, 505 N.W.2d at 279 (analyzing fraudulent inducement after the plaintiff "sought to avoid the 'present fact' rule"); *Higgins*, 309 N.W.2d at 197 (considering "the bad faith exception" after the plaintiff supported it); *Hi-Way Motor Co.*, 398 Mich. at 337 ("Plaintiffs further contend that . . . [representations] fall within the 'bad faith' exception."); *Cook*, 210 F.3d at 658 (rejecting a plaintiff's argument for the "bad faith exception").

It is true that Miller's counsel recognized in his closing statements that "you can't make a false representation about the future." (ECF No. 48, PageID.685.) He added that a plaintiff may still recover if the plaintiff can "prove some intent that [the defendant] . . . knew it was wrong when they said it." (*Id.*) This off-the-cuff statement, potentially indicating a claim for fraudulent inducement, lacked any substantial depth or legal analysis. It is not enough to override the whole course of the litigation whereby Miller asserted fraud generally and supported it with factual allegations indistinguishable from

a breach of contract. Miller provided no basis for the court or, more importantly, Defendants to believe he was advancing a fraudulent inducement claim. Without notice, the court did not instruct the jury on the legal nuances of fraudulent inducement and Defendants were not given an opportunity develop a case against it. The jury instructions included no reference to fraudulent inducement as a claim, the bad faith exception, the definition of bad faith, the elements of fraudulent inducement, or the economic loss doctrine. (ECF No. 38, PageID.381-83.) Furthermore, the court made clear to the jury that it should "apply the law that [the court] give[s] you in [jury] instructions," not law that is off-handedly mentioned by a party in closing arguments. (ECF No. 48, PageID.655.) "Juries are presumed to follow the instructions they are given." *United States v. Davis*, 306 F.3d 398, 416 (6th Cir. 2002).

Miller throws in the elements of fraudulent inducement in his response to Joaquin's motion for JNOV, but (oddly) not for Joaquin's motion for new trial. (ECF No. 57, PageID.898.) Miller's cursory argument, made over a month after the jury rendered a verdict, is too little too late. A party cannot amend a complaint, modify jury instructions, and effectively recast an entire claim after the jury has come to a decision. *See In re Ferro Corp. Derivative Litigation*, 511 F.3d 611, 624 (6th Cir. 2008) ("Following entry of final judgment, a party may not seek to amend their complaint without first moving to alter, set aside or vacate judgment."); *Thompson v. Thompson*, 935 F.2d 271 (Table), at *1 (6th Cir. 1991) (A party waives the right to challenge jury instructions "if he does not object to the instructions tendered at trial."). Nor does Miller formally ask to do so.

The court will not wade into the depths of Miller's murky trial arguments, most of which are in conflict with existing law, and attempt to intuit an underlying legal theory for fraudulent inducement based one quick reference at trial and briefing post-trial. The claim presented to the jury was fraud for past or existing misrepresentation. The jury instructions were in conformity with Michigan's established law for fraud. The bulk of Miller's arguments at trial concerned Joaquin's alleged actions constituting breach of contract, not fraud as generally accepted under Michigan law.

Thus, the jury erroneously found that Joaquin committed fraud. Miller presented no evidence or any legitimate inference that Joaquin made a past or present misstatement of fact, let alone clear and convincing evidence, as is required to prove fraud. *Matras*, 424 Mich. at 681-82; *Foodland Distribs.*, 559 N.W.2d at 382. Mere breach of contract is not evidence of fraud and claims that are factually indistinguishable from breach cannot sound in tort. *Marrero*, 505 N.W.2d at 279; *Higgins*, 309 N.W.2d at 197; *Huron Tool and Eng'g Co.*, 532 N.W.2d at 546. No reasonable juror could find Joaquin liable and Joaquin's motion for JNOV will be granted.[3] *Matras*, 424 Mich. at 681-82.

### D. Damages

The court notes that evidence in support of an $180,000 damages award was thin. For breach of contract, Miller may receive compensation to put him "in as good a position as if the contract had been fully performed." *Corl v. Huron Castings, Inc.*, 450 Mich. 620, 625 (1996). The contract between Miller and Father and Sons entitled Miller

---

[3] Further, the jury's verdict on Miller's fraud count was against the weight of evidence that could not "reasonably have been reached." *Conte*, 215 F.3d at 637. The court will conditionally grant a new trial on the issue of Joaquin's liability for fraud. *See* Mich. Ct. R. 2.610(C); Fed. R. Civ. P. 50(c).

to the fair market value of the coins. (ECF No. 47, PageID.547, 577.) Miller's "injury" under tort would also be the value of his coins. *Sutter v. Biggs*, 377 Mich. 80, 86 (1966). Miller did not allege emotional or physical damages. (ECF No. 1, PageID.4-9.) $180,000 is substantial considering that Joaquin undeniably obtained only $18,000 from willing institutional coin buyers. *Huron Ridge L.P. v. Ypsilanti Tp.*, 737 N.W.2d 187, 197 (Mich. Ct. App. 2007) ("Fair market value is the amount at which a willing buyer and willing seller would arrive in an open and competitive market."). (ECF No. 47, PageID.620.) The only basis for a $180,000 verdict offered into evidence is Miller's own valuation of the coins during his testimony at trial. (ECF No. 47, PageID.564.) "The owner of personal property is qualified to testify regarding the value of the property where the testimony does not relate to sentimental, personal or subjective value to the owner." *People v. Brown*, 445 N.W.2d 801, 802-03 (Mich. Ct. App. 1989). However, as described more fully below, Miller's trial testimony will be stricken from the record. Thus, the jury would have had no reasonable basis for finding Joaquin liable for $180,000 and JNOV could be granted on the issue of damages alone. *Matras*, 424 Mich. at 681-82.

Further, there is "reasonable probability" that statements made by Miller's counsel at trial, including asking the jury to "send . . . a message," questioning the jury "if it was your grandfather or father, would you trust them in the hands of Mr. Joaquin[?]," mentioning that Miller "is in pain all the time, can't walk, can hardly get in the courtroom," and labeling Joaquin as a New York "slickster," amongst other improper comments, were designed to, and did, exert undue and prejudicial influence on the jury. *Balsley v. LFP, Inc.*, 691 F.3d 747, 761 (6th Cir. 2012); *see United States v. Solivan*, 937 F.2d 1146, 1150 (6th Cir. 1991) (finding a "send a message" argument to be "a

single misstep so destructive to defendant's right to a fair trial that it constitutes reversable error"); *Johnson v. Howard*, 24 Fed. App'x 480, 487 (6th Cir. 2001) (reasoning that similar "Golden Rule" arguments, whereby a jury is asked to put themselves in the emotional state of mind of party effected by harmful conduct, are "universally condemned . . . as improper because they invite decision based on bias and prejudice rather than consideration of facts"). (ECF No. 48, PageID.687, 686, 684.) A new trial on damages would be necessary, at a minimum. *Balsley*, 691 F.3d at 761; *Holmes*, 78 F.3d at 1045-46. Nonetheless, due to the court's findings on JNOV as to liability, a separate ruling on damages is unnecessary.

### E. Miller's Failure to Provide Signed Interrogatory Answers

The last issue arose on September 7, 2018, when Defendants served Miller with discovery requests, which included a set of interrogatories. (ECF No. 13-1.) Miller refused to respond. Defendants moved to compel discovery on October 31, 2018 and the court granted the motion. (ECF Nos. 13, 15.) In its order, the court noted that "[Miller] failed to provide responses to Defendants' . . . discovery requests, which were due on October 8, 2018, and despite later agreeing to do so by October 26, 2018, failed again." (ECF No. 15, PageID.101.) The court specifically directed that Miller "produce complete responses to [the requests] . . . by Wednesday, November 14, 2018." (ECF No. 15, PageID.102.) The court noted that this ruling was orally communicated to Miller's counsel at a status conference. (*Id.*, PageID.101.) Defendants informed the court in April 2019 that, although Miller had responded to the interrogatories, they were "unverified and included several improper answers." (ECF No. 20, PageID.241.) The court noted this deficiency in yet another order on April 26, 2019. (*Id.*)

Instead of complying with the court's unambiguous orders, Miller's interrogatory responses did not include Miller's signature. (ECF No. 19-1, PageID.150-51.) The answers provided to Defendants contained only a signature of Defense counsel who originally sent over the discovery requests, absent-mindedly copied by Miller's counsel without a second thought or due diligence. (*Id.*) The Federal Rules of Civil Procedure are clear. "The person who makes the answers [to interrogatories] must sign them." Fed. R. Civ. P. 33(b)(5). Without a signature, Miller did not answer Defendants' interrogatories.

Miller's response also included answers that avoided questions or did not address them at all. When Miller was asked to identify written statements from persons claiming to have knowledge of the facts of the case, Miller responded: "None at this time worth producing." (ECF No. 19-1, PageID.140.) When asked to identify phone calls referred to in Miller's complaint, Miller answered: "Reviewing phone records to get exact dates." (*Id.*, PageID.148.) Miller was required by law to provide "full and complete responses." *Barron v. Univ. of Mich.*, 613 Fed. App'x 480, 484 (6th Cir. 2015). If Miller wished to object, he could have done so. Instead, he chose to file incomplete and unhelpful answers that gave Defendants little ability to respond and build their case. *Bass v. Jostens, Inc.*, 71 F.3d 237, 242 (6th Cir. 1995) (refusal to "completely answer interrogatories . . . prevented defendant from gathering evidence to support its defense."). As accurately described by a fellow district court in the Sixth Circuit, "interrogatory answers must be responsive, full, complete and unevasive. Further, a party may not defer answering or refuse to answer . . . by suggesting that the

information may be forthcoming." *Jones-McNamara v. Holzer Health Systems*, No. 2:13-cv-616, 2014 WL 3563406, at *1 (S.D. Ohio July 18, 2014).

Despite written orders of the court, Miller refused to provide adequate answers to Defendants' interrogatories before trial began. (ECF No. 46, PageID.434.) Defendants had made Miller aware of his failure to comply with the court order several times. (ECF No. 13, PageID.73; ECF No. 19, PageID.117-18; ECF No. 19-2, PageID.208 (Defense counsel explicitly telling Miller at Miller's deposition on February 15, 2019 that he had failed to sign the interrogatories); ECF No. 22, PageID.248-50.) Defendants filed another motion to compel four days before trial. (ECF No. 36.) The court held a motion hearing and granted Defendants' motion.

Nonetheless, Defendants still did not have admissible interrogatory answers at the start of trial. Defendants were forced yet again to resort to a motion to compel. (ECF No. 46, PageID.433.) The court then expressly stated to Miller's counsel, on the record in open court, that "the answers to the interrogatories should be signed" and followed-up by informing counsel that "[i]t is so ordered." (ECF No. 46, PageID.435.) If Miller somehow did not understand his responsibilities to sign and adequately answer Defendants' interrogatories, the court's oral order, made directly to Miller's attorney, should have cleared away any and all doubt. Yet, amazingly, Defendants did not receive a signed interrogatory before the jury verdict was reached. (ECF No. 52, PageID.787; ECF No. 58, PageID.908.)

The court will not go through the procedural vehicle of Federal Rule of Civil Procedure 60(b)(3), as Joaquin requests, to grant Joaquin a relief from judgment. Rule 60(b)(3) allows the court to relieve a party from a judgment in cases of "fraud (whether

previously called intrinsic or extrinsic), misrepresentation, or misconduct." "The party seeking relief . . . bears the burden of establishing the grounds for such relief by clear and convincing evidence." *Info-Hold, Inc. v. Sound Merchandising, Inc.*, 538 F.3d 448, 454 (6th Cir. 2008). Joaquin did not demonstrate that Miller committed fraud or made a misrepresentation, as opposed to disobeying court orders. *Id.*

Similarly, "misconduct" is reserved for "a deliberate act that adversely impacted the fairness of the . . . proceeding." *Travelers Cas. and Sur. Co. of Am. V. J.O.A. Const. Co., Inc.*, 479 Fed. App'x 684, 693 (6th Cir. 2012). Although Miller's improper behavior prejudiced Joaquin, as discussed further below, Joaquin has not shown by "clear and convincing evidence" that Miller acted deliberately to undermine the fairness of the proceeding by failing to sign interrogatories. *Id.* Given the high burden of proof, the strong public policy preference against relieving a party from a judgment, and the fact that relief is almost always denied in cases where the alleged misconduct was litigated (repeatedly) before judgment was entered, as it was here, the court will deny Joaquin's motion as to Rule 60(b)(3). *Info-Hold, Inc.*, 538 F.3d at 454; *Thurmond v. Wayne Cty. Sheriff Dept.*, 564 Fed. App'x 823, 830 (6th Cir. 2014) ("Ordinarily, Rule 60(b) relief is not available to remedy misconduct known to the movant before judgment [was] entered," especially when the misconduct was "persistently asserted as grounds for relief and repeatedly addressed by the district court.").

Instead, the court will issue sanctions through Federal Rule of Civil Procedure 37. If a party "fails to obey an order to provide or permit discovery . . . the court . . . may issue just orders." Fed. R. Civ. P. 37(b)(2). In fact, the court can dismiss an action where a "failure to cooperate with the court's discovery order is . . . conscious and

intentional." *Bass v. Jostens, Inc.*, 71 F.3d 237, 241 (6th Cir. 1995). After issuing a written order eight months before trial, discussing the court's order at a telephonic conference, noting Miller's failure to comply in a second order one month before trial, issuing a third order four days before trial, and providing a final fourth oral order immediately before trial began, the court finds enough evidence to prove an intentional disregard for the court's commands. Nonetheless, the court will resort to the less severe sanction, tailored specifically to Miller's violations: striking evidence of Miller's testimony from the record. The court has the authority to "prohibit[] the disobedient party . . . from introducing designated matters in evidence." Fed. R. Civ. P. 37(b)(2).

First, the evidence requested by Defendants in the form of Miller's interrogatory answers would have been useful for Joaquin at trial. *Freeland v. Amigo*, 103 F.3d 1271, 1277 (6th Cir. 1997) (Courts consider "whether the adversary was prejudiced" in crafting a sanction.). In Miller's answers, he admits that any breach of contract occurred in "conversations to [Father and Sons] collectables." (ECF No. 19-1, PageID.143.) Joaquin could have used this admission to cross-examine Miller and undermine the claim that Joaquin contracted with Miller personally. If evidence showed that Miller considered his commercial relationship to be with Father and Sons, the jury would have a weaker basis, if any at all, for finding Joaquin personally liable. The jury specifically asked for interrogatories while they were considering the outcome of the case during their deliberations. (ECF No. 48, PageID.712.) Given that Miller had no interrogatories and Miller denied Defendants the ability to present their own interrogatories, the court was unable to satisfy the jury's request. (*Id.*, PageID.720.)

Second, both the court and Defendants made repeated attempts to get Miller to properly answer Defendants' interrogatories. Miller failed to do so, having been made aware through his attorney and personally, months before trial. *Freeland*, 103 F.3d at 1277 ("[T]he party's failure to cooperate in discovery . . . due to willfulness, bad faith, or fault" is a factor to consider in sanctions.). (*See* ECF No. 15, PageID.102; ECF No. 19-2, PageID.208.) Third, Miller was "warned that failure to cooperate could lead to . . . sanction." *Id.* The court's oral order informed Miller's counsel that failure to abide by the directions of the court would mean that "[Miller] doesn't testify." (ECF No. 46, PageID.435.) Finally, since Miller refused to abide by his discovery obligations to the very end and throughout the trial, there is no "other effective alternative[] exist[ing] to discipline [Miller] . . . and to avoid prejudice to [Joaquin]." *Id.* The court tried mightily to get Miller to sign his answers through multiple orders and commands, yet Miller refused to do so. At this late stage, after a verdict has been reached, the court finds no remedy adequate beyond striking Miller's trial testimony from the record.

The court has granted JNOV in favor of Joaquin on all the counts of the verdict rendered against Joaquin even considering Miller's testimony. The removal of Miller's testimony, evidence central to any case Miller has, further bolsters the finding that no reasonable jury could find Joaquin personally liable for breach of contract or find Joaquin liable for conversion and fraud. *Matras*, 424 Mich. at 681-82 (discussing the standard for JNOV); *see also Conte*, 215 F.3d at 637 (describing the standard for new trial based on a verdict against the clear weight of the evidence).

## IV. CONCLUSION

Miller failed to present a valid claim that Joaquin personally contracted with Miller. Joaquin cannot be held personally liable for breach of contract. The rights and duties Miller seeks to enforce in this lawsuit arise entirely through an enforceable contract. Miller makes no attempt to distinguish Joaquin's behavior that caused breach from that which caused tortious harm. Thus, Miller's claim for conversion and fraud must fail. Miller's fraud claim must also fail because Miller failed to produce evidence of misrepresentation of a past or present fact. Miller did not sue for fraudulent inducement and the court will not amend, on its own, Miller's claims after a verdict has been reached. The court will grant Joaquin's motion for JNOV and conditionally grant Joaquin's motion for a new trial. Further, Miller committed a blatant violation of the court's repeated discovery orders. Miller will be sanctioned in that his trial testimony will be stricken from the record. Accordingly,

IT IS ORDERED that Defendant Michael Eric Joaquin's "Renewed Motion for Judgment as a Matter of Law" (ECF No. 54) is GRANTED. JUDGMENT IS AWARDED in favor of Joaquin and against Plaintiff Richard Graf Miller's as to fraud (Count 1), statutory conversion (Count 2), common law conversion (Count 3), and breach of contract (Count 8).

IT IS FURTHER ORDERED that Joaquin's "Motion for New Trial" (ECF No. 45) is CONDITIONALLY GRANTED.

Lastly, IT IS ORDERED that Joaquin's "Motion for Relief from Judgment" (ECF No. 52) is GRANTED IN PART and DENIED IN PART. Joaquin's motion is GRANTED as to sanctions and DENIED as to relief from judgment.

s/Robert H. Cleland                    /
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  December 17, 2019

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, December 17, 2019, by electronic and/or ordinary mail.

s/Lisa Wagner                    /
Case Manager and Deputy Clerk
(810) 292-6522

S:\Cleland\Cleland\JUDGE'S DESK\C2 ORDERS\18-11429.MILLER.JNOVandNewTrial.RMK2.docx